Blythe v. Bell, 2013 NCBC 8.

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 933

WILLIAM A. B. BLYTHE (individually
and in his capacity as shareholder) and
DRYMAX SPORTS, LLC,

        Plaintiffs,

        v.

ROBERT E. BELL III, VIRGINIA
BELL, NISSAN JOSEPH and
HICKORY BRANDS, INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

{1}    THIS MATTER is now before the court on Defendants' Motion to Exclude Testimony from William A. Barbee ("Barbee Motion") and Defendants' Motion to Strike or Preclude Expert Report of Charles M. Phillips ("Phillips Motion").

*Moore & Van Allen, PLLC by James P. McLoughlin, Jr., Mark A. Nebrig, Benjamin P. Fryer, Frank E. Schall, and Christopher D. Tomlinson for Plaintiffs William A. B. Blythe and Drymax Sports, LLC.*

*Ellis & Winters LLP by Andrew S. Chamberlin and C. Scott Meyers, and Young, Morphis, Bach & Taylor, LLP by Paul E. Culpepper for Defendants Robert E. Bell III, Virginia Bell, Nissan Joseph, and Hickory Brands, Inc.*

Gale, Judge.

## I.   NATURE OF MATTER BEFORE THE COURT

{2}   This litigation has spawned multiple motions upon which the court has issued written orders, including most recently orders dated December 10, 2012 and February 4, 2013 ruling upon three summary judgment motions.  Each of those are available at the court's website at www.ncbusinesscourt.net, and are referenced for facts and case history not repeated in this Order.

{3}   Plaintiffs seek to have Drymax Sports, LLC ("Drymax") recover profits it contends it lost as a result of Defendants' failures to abide by agreements and honor their fiduciary duties, which would have afforded sales and opportunities that were instead diverted to Hickory Brands, Inc. ("HBI").  Individual Plaintiff William A.B. Blythe ("Blythe"), HBI, Nissan Joseph ("Joseph") who is HBI's former president, and Robert E. Bell III ("Rob Bell") and Virginia Bell are Drymax's members.   The Bells have controlling ownership of HBI.

{4}   Plaintiffs seek to prove and quantify those alleged lost profits through the expert testimony of William A. Barbee ("Barbee").  Barbee prepared both an Initial Report dated August 1, 2012 and a Rebuttal Report dated September 20, 2012, and Defendants deposed him on those reports on August 27, 2012, and October 3, 2012.  Defendants moved to exclude Barbee's testimony on October 23, 2012.  As a part of their challenge, Defendants submit reports from their own experts, who contend that Barbee's damage determination is based on marketing opinions which Barbee is not qualified to make and which he reached based on an unreliable methodology. Plaintiffs do not offer Barbee as a marketing expert, but contend that his projected additional sales allow for the reasonable estimates he has made, and making such estimates is a valid exercise by a qualified damages expert. Plaintiffs designated Charles M. Phillips ("Phillips") as a rebuttal expert solely to provide testimony that the methodology Barbee used is proper.  Phillips does not himself intend to testify as to the amount of Plaintiffs' damages.  Defendants challenge the designation of Phillips as late and further argue that it is improper for Plaintiffs to have one expert vouch for another in this manner.

{5}     Defendants ground their Barbee motion primarily on *Howerton v. Arai Helmet, Ltd.*, which charges the trial court with preliminary questions concerning the qualifications of an expert or the admissibility of his testimony using a three-part test which inquires: "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?"  358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004).   This test embodies and applies the requirements for expert testimony defined by North Carolina Rule of Evidence 702(a).  Defendants emphasize that Barbee is not a qualified marketing expert and that without this expertise the method Barbee used is not sufficiently reliable to pass the *Howerton* test.  After careful examination, the court concludes that the motions turn instead on whether Barbee has a sufficiently certain basis for following the assumptions he utilized in the methods he adopted for his analysis.  Barbee is well qualified in the field of business valuation and financial forensics, and the methods he invoked are well recognized in those fields for quantifying damages.  However, those methods, as well as the North Carolina standards for proof of lost profits, *see, e.g.*, N.C.P.I. Civ. 517.20 and cases cited, require that projected lost revenues must not be based on conjecture or speculation.  The court concludes that Barbee's determination of loss based on actual sales and costs does not require such assumptions, but his projection of additional lost revenues, either past or present, does rest on conjecture and speculation and should therefore be excluded.  As such, the issue is more one of relevance than of examining the reliability of the methods Barbee invokes.  And, to the extent that Barbee's projections can be argued to have sufficient minimal indicia of certainty, the court concludes that any probative value of his testimony would be outweighed by the danger of unfair prejudice and unfair confusion of issues.  Accordingly, his testimony should be limited under North Carolina Rules of Evidence 402, 403 and 702 to his testimony regarding losses to date as based on actual sales made and costs incurred.  Accordingly, the Barbee Motion is GRANTED in part and DENIED in part.

{6}     Because the court finds that Barbee purported to base his determinations on recognized methodologies but had an inadequate basis to do so, it would be unnecessary and unfairly redundant for Plaintiffs to seek to bolster Barbee through Phillips' testimony. The court is not disputing that a damages expert can rely on reasonable estimates of additional sales as long as there is an adequate basis for such assumptions. Rather, the court concludes that there is no such adequate basis. That is a gate keeper function properly exercised by the court to which Phillips' testimony would not contribute. Accordingly, the court's ruling effectively moots the Phillips Motion, but if a ruling is required, the Phillips Motion is GRANTED. It may well be also that the court's ruling will make certain testimony from Defendants' expert irrelevant as well.

## II.     DISCUSSION

{7}     Barbee is Director of Litigation and Forensic Services for Greer & Walker, LLP, of Charlotte, North Carolina. Defendants do not really challenge Barbee as unqualified to testify as an expert in business valuation and the quantification of financial losses. They rather contend that he has strayed beyond his area of expertise into the marketing field, and he has created the marketing assumptions critical to his opinions without having the expertise to do so.

{8}     Barbee bases his testimony on the contested premise that the Operational Agreement is an enforceable operative agreement controlling the sale of socks using the Drymax Process. He assumes that the Operational Agreement calls for Drymax to receive sales dollars rather than a royalty and Drymax would then pay HBI the costs of goods plus a 20% markup. Barbee contends that had the Operational Agreement been followed, revenues Drymax would have enjoyed would have been adequate to repay the loan to HBI, and Drymax would have reasonably invested additional funds in marketing necessary to develop the Drymax brand and increase sales. He recaptures sales revenues from HBI and calculates the costs of goods upon which HBI would have been paid by Drymax. In addition he then

projects what additional sales would have been made to date as well as additional future sales that would be made with the additional revenue adequate to support marketing. Barbee examined a range of the branded apparel industry and evaluated Drymax sales representative testimony to support his conclusion that there was abundant opportunity for such additional sales. Based on his overall assessment of these various factors, rather than on a specific calculation, Barbee opines as to a growth percentage Drymax would enjoy, and having stated that rate of growth, he calculates additional sales and adjusts them for the expenses necessary to generate them, including the marketing dollars he assumed would be available and contributed to marketing efforts.

{9}     Barbee then separates his opinions of loss into three categories. First, he determines the profits that would have been enjoyed by Drymax had revenue from actual sales been booked at Drymax rather than at HBI. He opines that Drymax has lost approximately $3.3 million in this regard from 2007 to May 31, 2012, and that the figure will be updated to the date of trial based on actual further sales. He had sufficient records available to determine costs of goods as he employed the term. As to this particular calculation, Defendants challenge Barbee's definition of "costs of goods," just as they challenge the basic assumption that the Operational Agreement applies to the sale of socks in the first instance. But Defendants do not seriously challenge Barbee's qualifications and methodology as to this component of damages. Nevertheless, they say even this opinion should be excluded because Barbee has become so enmeshed in advocating for the adoption of Blythe's position on disputed facts that he can no longer be said to be an objective expert. Plaintiffs respond to this argument by attacking the *in limine* motion to exclude as an improper disguised effort to secure summary judgment, a tactic foreclosed by *Howerton.* As to this initial opinion Barbee offers, the court concludes: (1) Barbee is clearly qualified to present expert testimony regarding damage calculations so long as he does so using a recognized methodology; (2) Barbee utilized a recognized methodology in this initial determination; (3) while the facts upon which Barbee relies are clearly contested, they are based on the

evidentiary record and do not require speculation or conjecture, because they are based on actual sales and actual or reasonably assumed additional costs; (4) these facts and the manner in which Barbee applies them can be fairly and adequately attacked by cross-examination; and (5) Barbee should not be foreclosed from presenting his opinion because of improper or excessive bias. Accordingly, as to this initial opinion, the Barbee Motion is DENIED.

{10}   Barbee's other two damage determinations include projecting lost revenues from additional past or present socks sales, which Barbee contends would have occurred "but for" Defendants' wrongful acts. These projections are the primary focus of the Barbee Motion, and Plaintiffs offer the testimony of rebuttal expert Phillips to respond to Defendants' challenge to Barbee's methodology to arrive at those projections.

{11}   Barbee first projects an increase in Drymax's past sales that would have occurred had Drymax been afforded the revenue stream Barbee assumes was improperly diverted to HBI. He assumes those revenues would have repaid HBI's loan and then some of the revenue would have been spent on marketing. He then recalculates Drymax's sales with additional sales revenue in 2009 and 2010, which in turn leads to a recalculation of Drymax's growth rate in sales. Barbee then opines as to a future growth rate in sales that would result from additional marketing using additional sales revenue. He does not actually calculate the growth rate but estimates a growth rate based on his overall consideration of the evidentiary record and his own review of the branded apparel industry. Once he assumes a growth rate, he is able to calculate additional sales revenue and determine overall lost profits, reduced to present value. He opines that the present value of this loss is $7.4 million.

{12}   Using the same assumed growth rate and additional revenues, Barbee alternatively calculates Drymax's loss in business valuation. He discounted future lost profits based on a weighted average cost of capital and employed the Income Approach of valuation, with a "build up" using opportunity cost and risk. He calculated an overall loss of value of Drymax at $7.5 million. He then performed a

simple calculation to calculate the 40% of this loss Blythe personally suffered as a minority owner, which is $2.9 million.

{13}    In addition to challenging Barbee's lack of expertise to estimate sales revenue based on marketing opportunity, Defendants complain that they cannot be expected to rely on any ability to cross-examine Barbee because he either refuses to or cannot define the specific method or calculation demonstrating how he established his assumed growth rate in Drymax sales, but rather simply forms an opinion as to a fair growth rate based on his review of the entire record.   Plaintiffs counter that Barbee does not profess to be a marketing expert and that projecting further growth rates based on past performance and general market trends is an accepted reliable methodology and, in fact, one used regularly by Defendants' own experts.  Plaintiffs also argue that Defendants unfairly and inaccurately assert that Barbee attempted to tie specific additional sales to specific additional marketing dollars, when, in fact, Barbee did no more than projecting a reasonable future growth rate based on past performance.   He looked to testimony from Drymax sales representatives and industry data only to legitimate the clear opportunity for sustained growth.  Plaintiffs contend that thus projecting a future growth rate is well within the realm of typical of accepted expert testimony in the field.

{14}    The question then becomes whether Barbee has a basis for projecting additional sales that allows them to be stated with reasonable certainty rather than basing them on conjecture or speculation.  As stated, the North Carolina Supreme Court in *Howerton* stated three questions a trial court should examine: "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?"  358 N.C. at 458, 597 S.E.2d at 686.

{15}    The court first examines the field in which Barbee claims expertise and the methodology recognized in his field.  Barbee is a CPA, member of the American Institute of Certified Public Accountants ("AICPA"), and has been certified by the AICPA in the field of business valuation and financial forensics.  As indicated

above, the court concludes that Barbee is well qualified in the field of damages calculations. The court further concludes that he has expertise as an expert qualified to project lost revenues, provided, however, that he does so in accordance with the standards and methodologies recognized as reliable in his field.

{16} The court then has critically examined the methodologies which Barbee employed. Barbee is certified by the AICPA and can be expected to adhere to its standards. While those standards may be somewhat different and perhaps more relaxed for forensic testimony compared to attestation opinions, the AICPA recognizes limitations that must be imposed on methods used to estimate lost revenues. It has published a guideline on how to do so. Exhibits offered in connection with the Motions include Richard A. Pollack, et al., American Institute of Certified Public Accountants, *Calculating Lost Profits* (2006). This guideline discusses accepted methodologies and recognizes that

> damages for lost profits are recoverable only if the plaintiff can prove the damages related to lost profits are reasonable and that they have been calculated using reliable factors without undue speculation . . . The calculation of lost profits does not require precision, and an estimate of damages can be made. However, the loss cannot be based on speculation.

*Id.* at Ch. 8 ¶¶ 52–53. As discussed below, this is similar to restrictions imposed by the North Carolina evidentiary standard for recovering lost profits.

{17} The AICPA publication further describes four accepted methods normally used to calculate lost revenues. They are: (1) the "Before and After" method, which examines the plaintiff's prior experience and its experience after the defendant's acts to make a calculation in the nature of a "but for" determination; (2) the "Yardstick" or "Benchmark" method which may look, among other things, at the experience of similar companies or industry averages, provided that the plaintiff is sufficiently comparable to the "yardstick," and which inquiry may also include determinations based on pre-litigation projections; (3) a calculation based on an

underlying contract which defines the method for doing so; and (4) and an accounting of defendant's profits. *Id.* at Ch. 10 ¶¶ 61–71.

{18} Here, Barbee combines a Before and After approach and a Yardstick approach. As such, he invoked methods which are well recognized and accepted as reliable. The issue is whether he has applied them properly, and particularly whether he used estimates with the degree of reliability that methodologies demand. The court concludes that he does not have a sufficiently adequate basis to project additional sales, even if he has an adequate basis to define a baseline from past performance. The court also concludes that he has not done sufficient analysis to compare Drymax to the branded general apparel industry, including adjusting for market variables. Barbee may have an adequate basis to conclude that there was substantial upside potential that has been lost, based on testimony from Drymax sales representatives, but he strays into conjecture and speculation when he attempts to quantify those opportunities. In short, the court concludes that Barbee has invoked well recognized methodologies but he does not have a sufficient evidentiary basis upon which to utilize them. A similar conclusion arises when applying established North Carolina case precedent dealing with proof of lost profits.

{19} North Carolina allows a corporation to recover lost profits occasioned by a defendant's wrongful conduct so long as they can be proven with reasonable certainty. *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 356 S.E.2d 578 (1987). But in order to be admitted, evidence of such loss must qualify as reasonably certain. *Parris v. H. G. Fischer & Co.*, 221 N.C. 110, 112, 19 S.E.2d 128, 129 (1942). While the courts do not demand mathematical certitude in calculating lost profits, they do not countenance conjecture or speculation, and conjecture or speculation does not become admissible simply because it is presented by an expert. *Castle McCulloch v. Freedman,* 169 N.C. App. 497, 501-03, 610 S.E.2d 416, 420-21, *aff'd per curiam* 360 N.C. 57, 620 S.E.2d 674 (2005).

{20} The admissibility of testimony of lost profits and the determination of whether the testimony passes from conjecture to reasonable certainty is determined

from case to case and the evidentiary standard does not evolve into a rigid formula. *Iron Steamer, Ltd. v. Trinity Rest. Inc.*, 110 N.C. App. 843, 848, 431 S.Ed.2d 767, 770 (1993). While the amount of damages is generally reserved for the jury, the court determines as a matter of law whether the evidence would allow a jury to calculate lost profits with reasonable certainty. *Id.*, 431 S.E.2d at 771; *see also Old Well Water v. Collegiate Distrib.*, 2002 Lexis 1939, at *10 (N.C. Ct. App). An expert may use market analysis, business records of similar enterprises, *Iron Steamer, supra*, and sales figures from businesses of a similar size, location and type of product, *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 411, 466 S.Ed.2d 324, 331 (1996), but the testimony must still "pass the realm of conjecture, speculation, or opinion not founded on facts, and must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn." *Overnite Transp. Co. v. Int'l Brotherhood of Teamsters*, 257 N.C. 18, 30, 125 S.E.2d 277, 286 (1962).

{21} After having thoroughly studied the record and the respective briefs and arguments in detail, the court concludes that Barbee's calculation of additional lost revenues has not "passed the realm of conjecture or speculation." Proving that there were additional sales opportunities does not necessarily provide a basis for then opining as to the extent of additional sales that would come from those opportunities. Barbee identified the testimony of certain sales personnel which he believed demonstrated that Drymax socks in particular presented an opportunity for wide market acceptance with marketing support, and large upside potential sales numbers. (Barbee Rebuttal Report 4–8, attached to Br. in Supp. of Defs.' Mot. to Exclude Test. of William A. Barbee.) However, this testimony does not provide an anchor for the sales revenues Barbee projects. One of them, Michael Isaacson, indicated he had sold something in the range of $12,000–15,000 of Drymax socks to two dealers, but in his opinion, with a full marketing effort he could have sold more than $500,000. Another, Brett Richardson, testified he thought a reasonable 5 year plan would call for sales of $5 million. Several salesmen testified to the unique qualities of the Drymax socks which should lead to a large market acceptance. The

court concludes that this testimony is, at best, only slightly less speculative than the testimony refused by the North Carolina Court of Appeals in *Old Well Water v. Collegiate Distrib., supra.*

{22} Barbee may have properly looked to trends within his branded apparel industry segment in his effort to do a market based analysis. However, he did not further demonstrate an adequate basis to conclude that companies within that segment were fairly comparable to Drymax, either as product lines or otherwise.. It was speculative to assume that Drymax could be expected to perform within that industry as large, multi-product line companies such as VF Corporation (Northface), Columbia Sportswear, Deckers Outdoor Corp. (Teva), and Adidas.. Likewise, Barbee engages in speculation when opining that Drymax could establish additional sales outlets that would each achieve sales comparable to Drymax's largest and best customer.

{23} In sum, the court concludes that Barbee invoked methodologies that are themselves reliable, but he failed to satisfy the prerequites they demand, and he testimony fails to satisfy evidentiary standards for proof of lost profits. The court then concludes that Barbee's testimony as to additional sales revenues does not have a sufficient basis to be considered probative evidence, and he should not be permitted to testify as to losses other than those he determined on the basis of actual sales to the date of trial. The court's determination is made both in the exercise of its discretion and on its understanding and application of the standards expressed by the North Carolina Supreme Court in *Howerton*, which are, in turn, reflected in the provisions and Rules 104, 402, and 702 of the North Carolina Rules of Evidence.

{24} Because the court does not base its determination on Mr. Barbee's choice of methodology but rather the lack of reasonable certainty in the assumptions used to employ his methods, any testimony from Phillips would not be appropriate or necessary as rebuttal testimony. As a result, the court need not further determine whether Plaintiffs timely designated Phillips pursuant to the

case management deadlines for designating experts or the nature of their testimony.

{25} The court further concludes that the probative value, if any, of testimony from Barbee as to additional lost sales would be outweighed by unfair prejudice and unfair confusion, and any testimony from Phillips would be unnecessary and unduly cumulative. Accordingly, even if otherwise admissible, which the court believes it is not, the court in its discretion concludes that such expert testimony should be excluded pursuant to North Carolina Rule of Evidence 403.

## III. CONCLUSION

{26} For the reasons expressed above, the Barbee Motion is GRANTED in part and DENIED in part and the Phillips Motion is deemed to have become MOOT, or if not moot is GRANTED.

IT IS SO ORDERED this 4th day of February, 2013.